Rhett O. Millsaps II (SBN 348949)
rhett@lex-lumina.com
Mark P. McKenna (appearing pro hac vice)
mark@lex-lumina.com
Christopher J. Sprigman (appearing pro hac vice)
chris@lex-lumina.com
LEX LUMINA LLP
700 S. Flower Street, Suite 1000
Los Angeles, CA 90017
Telephone: (213) 600-6063

Martin Schwimmer (appearing pro hac vice)
Martin.Schwimmer@iamstobbs.com
STOBBS
214 W. Tremont Avenue, Suite 303
Charlotte, NC 28203
Telephone: (704) 702-6007

*Attorneys for Plaintiffs Adafruit Industries, LLC, Phillip Torrone, and Limor Fried*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| ADAFRUIT INDUSTRIES, LLC, PHILLIP TORRONE, and LIMOR FRIED,<br><br>Plaintiffs,<br><br>v.<br><br>DEFY GRAVITY, INC. d/b/a FLUX,<br><br>Defendant. | Case No. 3:26-cv-05480-LB<br><br>**AMENDED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Adafruit Industries, LLC ("Adafruit"), Phillip Torrone, and Limor Fried (collectively, "Plaintiffs"), by and through their undersigned counsel, for their Amended Complaint against defendant Defy Gravity, Inc. d/b/a Flux ("Defendant" or "Flux") hereby allege, on knowledge as to their own conduct and otherwise on information and belief, as follows:

## NATURE OF THE ACTION AND RELIEF SOUGHT

1. This is a civil action seeking a declaratory judgment and injunctive relief arising from Flux's improper legal threats hastily delivered through its legal counsel, a former FBI chief of staff, in an attempt to silence industry-leading journalistic outlet Adafruit. It also seeks monetary and injunctive relief for Flux's false suggestion that circuit boards designed and produced by Adafruit were instead the result of Flux's process, or in the alternative, Flux's infringement of the distinctive and nonfunctional design of Adafruit's circuit boards. Finally, it seeks monetary and injunctive relief for Flux's literally false statements about the number of users of its services, which Flux made consistently available and featured prominently on its website.

2. Adafruit is a 100% woman-owned company based in Brooklyn, New York that designs, manufactures, and sells electronics and electronic components, including printed circuit boards. Adafruit also runs a blog, which is widely read among the "maker" community that designs and builds DIY electronics components.

3. In the course of interviewing Flux's founders for a possible feature story on Adafruit's blog, Adafruit's Managing Director, Torrone, discovered that Flux appeared to be misrepresenting usage of its purported "AI-assisted design platform." Specifically, Flux's claims that its platform had more than a million "builders" who were working on more than 6.4 million projects substantially inflated the number of both builders and projects, making the Flux platform appear to be much more successful and widely-used than it in fact is. Flux's misrepresentations were repeated by its associated venture capital firm, 8VC, and by a number of other publications.

4. Additionally, in the process of researching Flux, Torrone discovered a significant security flaw caused by a server misconfiguration that was out in the open—that is, all the information necessary to exploit the security vulnerability was publicly viewable by anyone on Flux's website.

5. On May 22, 2026, Torrone alerted Flux to his concerns about Flux's misrepresentations, told Flux that he would not be writing a feature story about Flux, and notified Flux about the security flaw.

6. Flux responded hours later on May 22 by sending a demand letter through counsel at a top U.S. law firm to Adafruit, Torrone, and Limor Fried, Adafruit's founder, claiming that Torrone's actions "violate U.S. criminal law" under the Computer Fraud and Abuse Act ("CFAA") and that his statements are "harassing, patently false, and potentially defamatory," without any colorable basis for those claims. Flux's letter demanded a response *by the next day*. Flux's letter also demanded, among other things, that Plaintiffs confirm in writing that none of them shared Flux information with any other parties, and that Plaintiffs refrain from sharing publicly any of the information that Torrone discovered regarding Flux's misrepresentations or its security flaw. Flux's letter closed with a request that Adafruit share the letter with legal counsel and then noted that Flux "reserves all rights"—which Adafruit, Torrone, and Fried reasonably understood, in context, to mean that they could expect legal claims to be filed against them imminently unless they agreed to Flux's demands.

7. Flux's frivolous claims are a gross violation of Plaintiffs' First Amendment rights. The claims are meant solely to bully Adafruit, Torrone, and Fried into staying quiet about Flux's misrepresentations about the size and reach of its platform—misrepresentations that are highly relevant to the community of makers and DIY electronics components enthusiasts that Adafruit serves.

8. Plaintiffs, who have a very reasonable apprehension that Flux will imminently file suit and/or instigate a criminal action against them, seek a judgment declaring that they neither defamed Flux nor violated the CFAA.

9. In the process of investigating Flux and Flux's misrepresentations about its own products, Adafruit also discovered that Flux has misleadingly promoted its products and services by misrepresenting the source of certain circuit boards. Specifically, in a February 27, 2026, interview with CNBC anchor Jon Fortt, Matthias Wagner, Chief Executive Officer of Flux, described Flux's services while holding a circuit board that was actually produced by Adafruit, falsely suggesting that the circuit board was designed and produced by Flux. Alternatively, if the circuit board was, in fact, a Flux product, then Flux infringed Adafruit's rights in its distinctive and nonfunctional circuit-board design by producing a competing circuit board that copied Adafruit's. Flux's marketing of circuit

boards that copy Adafruit's design is likely to confuse consumers about the source of Flux's products, or about Adafruit's sponsorship of or affiliation with Flux and its products.

**PARTIES**

10. Plaintiff Adafruit is a New York limited liability company with its principal place of business in Brooklyn, New York.

11. Plaintiff Torrone is the Managing Director of Adafruit. He resides in Brooklyn, New York.

12. Plaintiff Fried is the CEO of Adafruit. She resides in Brooklyn, New York.

13. Defendant Flux is a Delaware corporation with a principal place of business at 340 Bryant Street, Floor 3, San Francisco, California 94107.

**JURISDICTION AND VENUE**

14. The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and 15 U.S.C. § 1121 because Plaintiffs assert claims under the Lanham Act, 15 U.S.C. § 1051 et seq. The Court has jurisdiction under 28 U.S.C. § 1331 because Plaintiffs seek a declaratory judgment under 28 U.S.C. §§ 2201 and 2202 that Plaintiffs have not violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030. The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiffs' request for a declaratory judgment that Plaintiffs did not defame Flux and corresponding injunctive relief because the claims are so related by a common nucleus of facts that they form part of the same case and controversy. The Court also has supplemental jurisdiction over Plaintiffs' common law unfair competition claim, because that claim is so related to Plaintiffs' Lanham Act claims by a common nucleus of operative fact that it is part of the same case and controversy.

15. This Court has personal jurisdiction over Defendant Flux in this action because Flux's principal place of business is located within this District, and Flux has engaged in substantial business within this District.

16. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(1) and (2) because Defendant Flux conducts substantial business within this District, and a substantial part of the acts or omissions giving rise to Plaintiffs' claims occurred in this District.

## DIVISIONAL ASSIGNMENT

17. This action is properly assigned to the San Francisco Division of this District under Civil Local Rules 3-2(c) and 3-2(d) because Defendant Flux is headquartered in San Francisco County, which is the county where a substantial part of the events giving rise to Plaintiffs' claims occurred and where a substantial part of the property that is the subject of the action is situated.

## FACTUAL BACKGROUND

**Plaintiffs Adafruit, Torrone, and Fried**

18. Plaintiff Adafruit is a 100% women-owned manufacturing company and a certified Minority and Woman-owned Business Enterprise. It designs, manufactures, and sells electronics and electronic components, including printed circuit boards, in its factory lofts in Brooklyn's Industry City. Adafruit sells its wide variety of products on its website at www.adafruit.com.

19. Plaintiff Torrone is the Managing Director of Adafruit. He is married to Plaintiff Fried. Torrone was previously director of new media for the digital design firm Braincraft and senior editor at *Make Magazine,* where he also worked on the Maker Shed online store and on Maker Faire, a family-friendly festival. He was also senior editor at *Popular Science,* how-to editor at *Engadget*, and founder of Hackaday.com.

20. Plaintiff Limor "Ladyada" Fried, an MIT-trained engineer, founded Adafruit in 2005. The Ladyada name honors Lady Ada Lovelace, one of the inventors of the computer. Fried has been named to the Forbes Innovator 250 list. She was the first female engineer featured on the cover of *Wired* magazine.



21. In 2016, the White House named Fried a Champion of Change to honor her contributions to the "maker movement"—a global, technology-based extension of do-it-yourself ("DIY") culture that champions hands-on creativity, engineering, and innovation. The maker movement transitions people from passive consumers into active creators by utilizing digital fabrication tools, open-source hardware, and collaborative community spaces.




22. Adafruit maintains several social media accounts and other online outlets. Drawing on Torrone's extensive background as a journalist in the industry, Adafruit's outlets do much more than merely promote Adafruit's products—they allow Adafruit to function as a major voice in the maker/DIY and open-source hardware communities.

23. For example, Adafruit maintains a blog at https://blog.adafruit.com/. The blog has approximately 380,000 monthly users according to Google Analytics. The blog breaks news stories in the DIY electronics industry and is notable for Adafruit's rigorous and transparent editorial standards set out at https://www.adafruit.com/editorialstandards. The blog's stories are regularly picked up by the leading press outlets serving the maker, DIY, and open-source hardware and software communities, such as *The Verge*, *Ars Technica*, *Engadget*, and *Slashdot*.

24. Adafruit also maintains a YouTube channel at https://www.youtube.com/@adafruit. Adafruit's YouTube channel has 467,000 subscribers and has published more than 11,000 videos.

25. Adafruit's account on the X social media platform (@adafruit) amplifies Adafruit's reach by publishing to its 241,100 followers posts that include links to its blog and YouTube channel.

Adafruit also disseminates content through Mastodon (mastodon.cloud/@adafruit), Instagram (instgram.com/Adafruit), GitHub (github.com/Adafruit), Facebook (facebook.com/adafruitindustries), and LinkedIn (linkedin.com/company/Adafruit).

26. Adafruit's social media outlets report on technical developments in the open-source and DIY world, spotlight projects created by customers and Adafruit staff, and disseminate educational material, such as "L is for LED", a video for children.




**<u>Adafruit's Design and Development of Distinctive Circuit Boards</u>**

27. In 2016, Adafruit designed and began selling a distinctive circuit board called Circuit Playground, now known as Circuit Playground Classic. Soon thereafter, the product family expanded to include the Circuit Playground Express, and then the Circuit Playground Bluefruit.

28. The Circuit Playground circuit boards share a common design, which consists of a round, palm-sized circuit board.



29. The Circuit Playground circuit boards are unique in appearance. The Circuit Playground Classic and Circuit Playground Express are characterized by their round shape, distinctive rounded alligator clip parts, 10-bulb RGB LED ring, balanced centered component layout, icons for each sensor/output, and "Adafruit Black" mask and gold plate (collectively, "the Circuit Playground Design"). The Circuit Playground Design sets the Circuit Playground circuit boards apart, visually, from any other circuit board offered in the market. The Circuit Playground Bluefruit shares all of those design features, except that it is blue rather than black.

30. In the circuit board product category, virtually all circuit boards are hidden away in opaque product cases. Adafruit designed the Circuit Playground line so that the circuit boards would be fun and compelling to look at.

31. Adafruit sells a translucent case with its Circuit Playground boards so that people can enjoy looking at the boards, even after they have been incorporated into a device.

32. The Circuit Playground Design has achieved secondary meaning through its widespread depiction in Adafruit's promotional efforts and in third-party media editorial coverage.

33. For example, the Circuit Playground Design has been displayed on covers of magazines that cover the electronics DIY industry.



34. Many of the individual features of the Circuit Playground Design are unique and unusual in the field, including the Adafruit Black mask, which is more expensive than the standard green color, and the gold plate, which is more expensive than the standard silver tin. The overall appearance of Adafruit's Circuit Playground Design is distinctive and has become known in the industry.

35. The Circuit Playground Design silhouette also appears on a commercially offered third-party shirt depicting Adafruit boards.




36. The Circuit Playground circuit boards have been widely reviewed. Reviewers on YouTube often depict the Circuit Playground Design.




37. The Circuit Playground Design appeared in the television series *Agents of S.H.I.E.L.D*.



38. The overall Circuit Playground Design is nonfunctional. The Circuit Playground Design is comprised of several ornamental features that, together as a whole, are not essential to the use or purpose of the circuit board and increase its cost relative to standard features of competing circuit boards.




**<u>Defendant Flux and Its Claims of One Million-Plus Users</u>**

39. Flux claims to be an AI-assisted design platform. Specifically, on its website, Flux describes itself as "an AI-powered assistant that speeds-up tasks, provides real-time insights, and modifies your PCB [printed circuit board] design directly." A copy of a document provided on Flux's website titled "Getting Started with Flux" is attached hereto as Exhibit A.

40. On February 27, 2026, Flux published a post on its blog ("the Flux Blog Post") that stated in part: "To date, **1,099,361** builders have used Flux to create **6,425,482** projects, and this raise gives us the resources to move faster and to help more builders move through the hardware workflow with less friction." (emphasis in original). A copy of the Flux Blog Post is attached hereto as Exhibit B. That post was signed by "Lance, Matthias, and the Flux team." Lance Cassidy is the Founder and Chief Operating Officer of Flux, and Matthias Wagner is the Founder and Chief Executive Officer of Flux.

41. On February 27, 2026, Flux caused a press release to be distributed to a public relations website, GlobalNewsWire, which stated in part: "More than 1 million makers, designers, and

entrepreneurs have used Flux to design nearly 6.5 million devices, from wearables to robots to smart home controllers and drone navigation systems." Torrone became aware of Flux based on that press release, a copy of which is attached hereto as Exhibit C.

42. The information in the Flux Blog Post was widely disseminated. For example, on March 5, 2026, a tech industry publication, *The Top Voices*, reported that Flux had recently raised $37 million in new venture capital funding, repeating claims from the Flux Blog Post that "[t]oday, more than 1,099,361 builders have created over 6,425,482 projects on the platform, reflecting growing adoption across the hardware community." A copy of that article is attached hereto as Exhibit D.

43. Another industry publication, *The SaaS News*, also reported on the Flux funding round, stating that "[w]ith over **1 million** users designing nearly **6.5 million** devices globally, Flux empowers individuals and businesses to innovate across applications ranging from IoT devices to biomedical platforms" (emphasis added). A copy of that article is attached hereto as Exhibit E.

44. On February 27, 2026, the venture capital firm 8VC republished Flux's claim of one million users, posting on X that it was "Proud to lead @BuildWith Flux's $27M (sic) Series B . . . 1M users and 6.5 projects later, the creative hardware revolution is here." The 8VC post on X also embedded a 42 second video depicting Matthias Wagner promoting the Flux product. In that video, Wagner stated, "We've already seen millions of engineers turn their ideas into hardware with Flux." A screenshot of the post is attached hereto as Exhibit F.



**<u>Flux's Claim of 1 Million "Builders" Is False</u>**

45. On October 23, 2025, Flux claimed on its website home page to have 1,099,361 Builders. A copy of Flux's home page as of that date taken from the Wayback Machine is attached hereto as Exhibit G. Flux claimed to have 1,099,361 Builders on November 22, 2025. A copy of Flux's home page as of that date taken from the Wayback Machine is attached hereto as Exhibit H. On January 3, 2026, Flux claimed on its home page to have 1,099,361 Builders. A copy of Flux's home page as of that date taken from the Wayback Machine is attached hereto as Exhibit I. As of June 5, 2026, the date of Adafruit's initial complaint in this matter, Flux claimed on its home page to have 1,099,361 Builders. A copy of Flux's home page as of that date is attached hereto as Exhibit J.

46. As of September 30, 2026, Flux continues to claim 1,099,361 Builders on its blog at https://www.flux.ai/p/blog/we-raised-37m-to-take-the-hard-out-of-hardware. A copy of that blog post taken today is attached hereto as Exhibit K (the "Blog Post").

47. In the context of Flux's home page, the reported number of Builders, Projects, and Components would be understood by market participants to represent an up-to-date count that changes rapidly— because people understand that there would need to be daily and continuous growth in the number of users for a start-up to achieve such significant user numbers. Market participants would also note that the numbers "1,099,361", "6,425,482", and "821,334" (collectively, the "Numbers"), do not appear to be rounded estimates, but rather exact figures. For this reason as well, market participants are likely to perceive the Numbers as up-to-date, precise numbers, likely generated by an automated counter.

48. Upon information and belief, however, Flux did not use a counter applet to generate and display the Metrics. The purported counter displayed static text, and the same values appear in the preserved archival captures.

```
    <div class="number-stats">1,099,361</div> == $0
    <div class="text-block-64">Builders</div>
  </div>
▼<div id="w-node-f5f0c11d-80cb-7674-e4a5-e071fd579606-3e9ce52b">
    <div class="number-stats">6,425,482</div>
    <div class="text-block-64">Projects</div>
  </div>
▼<div id="w-node-_20f533dd-83d7-6204-de98-f3584cd9c526-3e9ce52b">
    <div class="number-stats">821,334</div>
    <div class="text-block-64">Components</div>
```

49. In sum, the same Numbers appear in the preserved homepage captures from October 23, 2025, through at least as late as June 5, 2026, spanning more than seven months, to represent three ordinarily dynamic metrics of product use—registered user, projects, and components.

50. Flux's quotation of these precise Numbers in Flux's Blog Post, and its repetition of the Numbers since then, suggest Flux's awareness of the Numbers in February 2026 (the date of its Blog Post). As the Numbers were viewable every day for more than seven months on Flux's home page, Flux presumably also was aware that the Numbers were static, and therefore wrong.

**<u>Adafruit's Communications with Flux</u>**

51. In his capacity as a technology journalist publishing on Adafruit's blog, Torrone reached out to Flux CEO Wagner on March 1, 2026. Torrone was interested in reviewing the Flux product because software that would greatly simplify the process of designing and fabricating printed circuit boards makes the platform of great interest to Adafruit's audience, many of whom are makers who might use Flux to design printed circuit boards and other DIY electronics hardware projects.

52. Over the course of March 2026, Torrone was in email dialogue with employees and representatives of Flux regarding a possible profile on the Adafruit blog. A copy of the 12 emails between Torrone and Flux during that time are attached hereto as Exhibit L.

53. The emails from Torrone consisted primarily of questions that Torrone drafted for Flux and 8VC, Flux's venture capital firm, regarding Flux's products and services. Flux copied Firebrand, Flux's public relations firm, and Firebrand provided the substantive responses to Torrone's questions.

Many of those responses, especially to Torrone's requests for substantiation of Flux's claims regarding the number of users and projects on the platform, were evasive.

54. Relying on his experience as a participant and chronicler of the maker industry, Torrone was skeptical that a product targeting DIY engineers could have 1 million registered accounts and more than 6.4 million bona fide projects. In Torrone's experience, the maker market for printed circuit boards and other DIY electronics components was far too small to support such large numbers.

55. Torrone created a user account on Flux as part of his intended product review of Flux on the Adafruit blog.

56. In light of the evasive responses to some of Torrone's questions provided by Flux and Firebrand, Torrone began to form the opinion that Flux's claims regarding the number of users and projects on the platform were false. Flux declined to identify any customer of Flux, even if Torrone promised to maintain the anonymity of any such customer's identity in his reporting. Torrone doubted that a firm that claimed to have over one million customers could not identify a single customer who was willing to be identified.

57. Torrone's review of the projects shown on publicly accessible areas of the Flux website suggested to him that Flux's claims regarding the number of users and projects was considerably exaggerated.

58. On May 22, 2026, Torrone wrote to Flux stating that he believed that the claims made by Flux and their funders regarding the number of users and projects on Flux's platform were false. Torrone also came to the conclusion that certain other statements Flux made, for example statements regarding electronic components designed on Flux having been used in a space mission, were false.

59. In that same May 22 email, Torrone attached a short report regarding a security vulnerability he had noticed while using the Flux website. It is common in the industry for users to report security vulnerabilities like the one Torrone reported to Flux. While he was on the Flux site, Torrone noticed that the site had some performance issues, including failing to log out users who had requested to be logged out. In addition, it was Torrone's regular practice, when reviewing a web-based

service like Flux, to determine whether the site might have security issues—Torrone's readership would expect that Torrone would recommend only web-based services that had secure websites.

60. The information contained in Torrone's security vulnerability report to Flux was obtained by accessing information available out in the open to anyone who visits Flux's website. Neither Torrone nor anyone else at Adafruit ever bypassed a security measure on the Flux site or exceeded the scope of their permissions to learn of the security flaw. Torrone sought no benefit from reporting this security vulnerability. He did it voluntarily and in a good faith effort to alert Flux to a problem with its website's security.

61. The information that creates the security vulnerability that Torrone reported to Flux can be accessed through the following steps, available to anyone visiting Flux's public website. These steps are visually depicted in Exhibit M attached hereto.

i. Visit flux.ai website without a login;

ii. Open the browser's developer panel (the developer panel is a regular feature of modern browsers and can usually be accessed with a few keystrokes—for example, option+command+I on the Chrome browser running on a mac computer);

iii. In the developer panel, click on the Application pane;

iv. Locate the navigation bar for application keys/values on the left side;

v. Scroll and select/open to Storage -> IndexedDB -> firebaseLocalStorageDb -> firebaseLocalStorage;

vi. Locate the 'fbase_key' on the right side of the Applications pane. Click on the value (which sometimes opens to view) or select it all and paste into a text editor; and

vii. Locate the firebase apiKey, appName and stsTokenManager:accessToken (sts is for 'security token service') that is provisioned by Flux for anonymous use of the Flux website without the need to complete log-in credentials.

**<u>Flux's May 22 Demand Letter to Adafruit</u>**

62. Several hours after Torrone sent his May 22 email, Jonathan Lenzner, a former FBI chief of staff and a partner in the Fenwick law firm whom Fenwick touts as "a nationally recognized leader in high-stakes crisis management," acting on behalf of Flux, sent a demand letter to Adafruit, attached hereto Exhibit N (the "Demand Letter").

63. Flux's Demand Letter asserts that Torrone's May 22 email contained "demonstrably false" statements that defamed Flux and its CEO. Further, it asserts that Adafruit's security disclosures "violated federal law"—specifically the CFAA—and threatened *criminal* liability under the CFAA. Further, Flux's counsel asserted—without offering any evidence or explanation—that Adafruit and Limor Fried had "aided and abetted" Torrone's alleged lawbreaking.

64. On May 23, Adafruit acknowledged receipt of the Demand Letter through an email from its counsel. A copy of that email is attached hereto as Exhibit O.

65. On May 26, Adafruit, through counsel, requested clarification of several points in the Demand Letter relating to whether the alleged defamatory content had been published—which it has not been—and requested that Flux explain its theory as to why Torrone's activities were unlawful under the CFAA—which they plainly are not. A copy of Adafruit's counsel's email is attached hereto as Exhibit P.

66. On May 28, Flux reiterated its demands in an email from Lenzner, its counsel at Fenwick. Flux asserted that the defamatory content was published by means of copying Flux's venture capital firm 8VC —a firm that had publicly repeated Flux's false claims about the number of users and projects—on the emails between Torrone and Flux. Flux also claimed that the CFAA applied because, in its view, Torrone did not act in good faith. Lenzner concluded his email by stating, "Your timely provision of the information and assurances [previously demanded by Flux] is imperative if we are to move from a path of confrontation to a path toward resolution." A copy of Lenzner's May 28 email is attached hereto as Exhibit Q.

**<u>Flux's Misrepresentations Regarding Adafruit's Circuit Playground Design</u>**

67. On February 27, 2026, Flux CEO Matthias Wagner was interviewed on the "Fortt Knox" video series on CNBC. Fortt Knox is a popular video series and podcast hosted by CNBC anchor Jon Fortt. CNBC promotes the series as one that consists of interviews with "innovators shaping the future and thinkers measuring the stakes." https://www.cnbc.com/fortt-knox/#:~:text=Jon%20Fortt%20speaks%20with%20innovators,VIDEO15%3A33. The video of the episode featuring Wagner remains available at https://www.cnbc.com/video/2026/02/27/matthias-wagner-flux-ceo-a-fortt-knox-conversation.html.

68. Fortt begins the interview with Wagner by asking Wagner what "is today's toughest problem that you're trying to solve at Flux?" Wagner responds that Flux is "lowering th[e] barrier" to making custom electronics hardware. According to Wagner, that's the tough problem Flux is solving for its customers—allowing them to make their own custom electronics to "have a more defensive position, lower the cost."

69. As Wagner explains how Flux is making it possible for customers to make their own custom electronics, he holds a circuit board in his hand to illustrate, specifically describing how "AI agents now enable [Flux] to automate the work, to go from a prompt to a … working appliance," implying that it was the Flux AI agents that enabled production of the working appliance in Wagner's hand. In fact, on information and belief, the board Wagner displayed is Adafruit's Circuit Playground Express. Adafruit's saved order records show an order for Circuit Playground Express products under Matthias Wagner and Defy Gravity Inc. dated December 25, 2019.

70. A few minutes later in the Fortt Knox episode, Wagner again holds up a Circuit Playground Express circuit board as he answers Fortt's question about use cases in which businesses "find it worthwhile and important to have this custom work done versus getting something off the shelf." Wagner describes a favorite example of a customer of Flux that makes vending machines. Before Flux, Wagner says, "they would buy four or five off the shelf PCB boards, integrate them into a single vending machine, you know, and assemble and sell that." In contrast to that costly approach, "now fast forward to them using Flux. They can make a single integrated board, where they pay

pennies on the dollar because now they're paying to get *this* made." Wagner punctuates "this" by again holding up to the camera Adafruit's Circuit Playground Express circuit board.

71. Furthermore, in response to the very next question, Wagner again holds up Adafruit's Circuit Playground Express circuit board to explain how Flux gives engineers the time to build custom electronics hardware. Because the tooling for that hardware used to be designed to serve big enterprises, "it wasn't a process designed to be efficient, fast, cheap, that an SMB [small or medium business] can pick this up at scale. And so that's the big unlock here, but it's like, look, I think today we help our customers build small to mid-size complexity electronics"—a statement Wagner emphasized with yet another display of Adafruit's Circuit Playground Express circuit board.

72. Wagner's repeated display of the Adafruit Circuit Playground Express circuit board in explaining Flux's AI-enabled design process implies that the circuit board displayed by Wagner is the result of Flux's process. Reasonable consumers would understand Wagner's reference to "this" to be a reference to the product in Wagner's hand, a product those consumers would reasonably understand to be a Flux-generated product. But, in fact, the distinctive Circuit Playground Express circuit board is an Adafruit product.

73. If, in the alternative, the circuit board displayed by Wagner was designed and produced by Flux, then Flux has copied Adafruit's distinctive and nonfunctional Circuit Playground Design. Many consumers in the DIY community recognize Adafruit's distinctive Circuit Playground Design, and those consumers are likely to be confused about the source of Flux's products, and/or about Adafruit's relationship with or sponsorship of Flux and its products.

## FIRST CLAIM FOR RELIEF

### Declaratory Judgment that Plaintiffs Have Not Violated the Computer Fraud and Abuse Act (18 U.S.C. § 1030) ("CFAA")

74. Plaintiffs hereby incorporate by reference the allegations of the preceding paragraphs as though fully set forth herein.

75. Under the Declaratory Judgment Act, courts may "declare the rights and other legal relations" of parties "to a case of actual controversy." 28 U.S.C. § 2201.

76. An actual controversy exists between Adafruit, Torrone, and Fried, on the one hand, and Flux, on the other. Flux, through its demand letters and threats of litigation and false allegations of criminal conduct, is attempting to use the law to silence Adafruit, Torrone, and Fried, and to keep the falsity of its claims regarding its number of users and projects from being known.

77. Flux's claims that Torrone's accessing of information on the Flux website that was *publicly accessible* violated the CFAA are false, and Flux knows or should know they are false. Torrone did not engage in any unauthorized access of Flux's systems. He did not defeat any access controls protecting private areas of Flux's site. Indeed, Torrone at no time accessed any areas of Flux's website or associated computer systems that were not open to any member of the public using Flux's site. Nor did Torrone see any files, or access any information, that were not available to any member of the public using Flux's site. And yet Flux has threatened Adafruit, Torrone, and Fried with litigation under the CFAA—and possible criminal referral—if they refuse to comply with Flux's demands, which are intended to keep Flux's materially false representations from becoming known to the public.

78. Adafruit, Torrone, and Fried therefore have a real and reasonable apprehension that they will be subject to legal action if they do not accede to Flux's demands. This apprehension was caused by Flux's actions, specifically its demand letters sent to Adafruit by Flux's counsel Lenzner threatening legal action, including possible criminal referral, against Adafruit, Torrone, and Fried.

79. On August 31, 2026, Flux provided Plaintiffs with a document titled "Release of Claim" that purports to release Plaintiffs Adafruit, Torrone, and Fried from any claim under the CFAA, stating that it "perpetually, unconditionally, and irrevocably releases and disclaims any intent to file any claim against Plaintiffs Adafruit Industries, LLC, Phillip Torrone, or Limor Fried under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, that is based upon or related to the actions by Plaintiffs that led to the 'security vulnerability report' sent by Torrone to Flux on May 22, 2026." But that release does not fully remove the CFAA threat. That CFAA also provides for potential criminal liability, which Flux's counsel threatened when he implied that Flux would refer Plaintiffs to the Department of Justice. That baseless threat remains outstanding.

80. The controversy between Plaintiffs and Flux is thus real and substantial and demands specific relief through a decree of a conclusive character.

81. Plaintiffs are entitled to declaratory judgment that they did not violate the CFAA in reporting to Flux a security flaw they discovered based wholly on publicly available information on Flux's website, including injunctive relief to enjoin Flux from making assertions that they violated the CFAA in doing so.

**SECOND CLAIM FOR RELIEF**
**Declaratory Judgment that Plaintiffs Did Not Defame Flux**

82. Plaintiffs hereby incorporate by reference the allegations of the preceding paragraphs as though fully set forth herein.

83. There is a real and actual controversy between Plaintiffs and Flux regarding whether the emails at issue sent by Torrone constitute defamation of Flux.

84. Torrone never made any false statements about Flux. Torrone informed Flux of his conclusion that Flux was overstating the number of users and projects and set out his basis for that conclusion. Flux's claims regarding its number of users and projects are in fact false, and thus Torrone's statements cannot be defamatory.

85. Torrone also did not publish any of his statements to third parties. Torrone included 8VC, Flux's venture capital firm, on the email communications at issue because 8VC adopted Flux's statements as its own and publicly repeated them, in the context of touting Flux's capital raise.

86. Additionally, a California Statement of Information filed on May 15, 2026 lists Francisco Gimenez—the 8VC partner whom Torrone included on his email communications—as one of three directors of Flux.

87. As discussed above, upon information and belief, Flux has misstated its number of registered users, or builders, and projects created by the supposed builders. The failure of Flux to identify any meaningful level of use of its projects by third parties (as opposed to use by Flux employees and Flux-affiliated entities) suggests that Flux has materially misstated the level of customer acceptance for its product.

88. Flux's threat of legal action against Plaintiffs for defamation is intended to stop Plaintiffs from reporting the results of Torrone's investigation and thus has a deliberate chilling effect on Plaintiffs' First Amendment rights to speak and report on matters of public interest.

89. Plaintiffs are entitled to declaratory judgment that they did not defame Flux by making truthful statements about Flux's misrepresentation of its number of users and projects that were never published to any third party.

## THIRD CLAIM FOR RELIEF BY ADAFRUIT
**False Designation of Origin (Reverse Passing Off)**
**in Violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A)**

90. Plaintiffs hereby incorporate by reference the allegations of the preceding paragraphs as though fully set forth herein.

91. Flux's repeated suggestion that Adafruit's Circuit Playground Express circuit board was in fact a Flux product constitutes a false designation of origin and a false representation that Flux is the source of Adafruit's Circuit Playground Express product in violation of Section 43(a)(1)(A) of the Lanham Act (15 U.S.C. § 1125(a)(1)(A)).

92. Flux's conduct is willful, deliberate, and intended to trade upon the goodwill, quality, and reputation of Adafruit's Circuit Playground Express circuit board and Circuit Playground Design.

93. As a direct and proximate result of Flux's aforesaid actions, Adafruit has suffered, and will continue to suffer, irreparable harm to its business, reputation, and goodwill.

94. Upon information and belief, Flux has obtained gains, profits and advantages as a result of its wrongful acts and will continue to do so in an amount thus far not determined.

95. Adafruit is entitled to injunctive relief, actual damages, disgorgement of Flux's profits, and attorneys' fees pursuant to 15 U.S.C. § 1117.

## FOURTH CLAIM FOR RELIEF BY ADAFRUIT
**Trade Dress Infringement in Violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A)**

96. Plaintiffs hereby incorporate by reference the allegations of the preceding paragraphs as though fully set forth herein.

97. In the alternative, if the circuit board displayed by Wagner during the Fortt Knox episode was produced by Flux, then Flux is marketing a circuit board that copies Adafruit's distinctive and nonfunctional Circuit Playground Design.

98. Flux's marketing of its circuit board willfully infringes Adafruit's rights in the Circuit Playground Design in violation of Section 43(a)(1)(A) of the Lanham Act (15 U.S.C. § 1125(a)(1)(A)).

99. As a direct and proximate result of Flux's aforesaid actions, Adafruit has suffered, and will continue to suffer, irreparable harm to its business, reputation, and goodwill.

100. Upon information and belief, Flux has obtained gains, profits and advantages as a result of its wrongful acts and will continue to do so in an amount thus far not determined.

101. Adafruit is entitled to injunctive relief, actual damages, disgorgement of Flux's profits, and attorneys' fees pursuant to 15 U.S.C. § 1117.

**FIFTH CLAIM FOR RELIEF BY ADAFRUIT**
**Common Law Unfair Competition**

102. Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

103. Flux's acts of reverse passing off and/or its copying of the Circuit Playground Design constitute unfair competition under the common law of the State of California, causing injury and damage to Adafruit's business and reputation.

104. Upon information and belief, Flux has obtained gains, profits and advantages as a result of its wrongful acts and will continue to do so in an amount thus far not determined.

**SIXTH CLAIM FOR RELIEF BY ADAFRUIT**
**False Advertising in Violation of the Lanham Act, 15 U.S.C. §1125(a)(1)(B)**

105. Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

106. Flux made literally false statements on the Flux website and in other commercial advertising and promotion regarding the number of "builders" who have used Flux's products and the

number of "projects" and "devices" those "builders" have made, in violation of Section 43(a)(1)(B) of the Lanham Act (15 U.S.C. § 1125(a)(1)(B)).

107. Flux's false statements harmed and continue to harm Adafruit by misrepresenting the level of consumer acceptance of Flux's products. Flux's false statements likely deceived and will continue to deceive consumers regarding the level of consumer acceptance of Flux's products. Flux's deception of consumers is likely to materially affect consumer purchasing decisions regarding Flux's products, to the detriment of others selling products or services in the relevant market, including Adafruit.

108. Upon information and belief, Flux has obtained gains, profits and advantages as a result of its wrongful acts and will continue to do so in an amount thus far not determined.

109. Adafruit is entitled to injunctive relief, actual damages, disgorgement of Flux's profits, and attorneys' fees pursuant to 15 U.S.C. § 1117.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendant Flux as follows:

A. For a declaratory judgment that Plaintiffs have not violated the CFAA or defamed Flux;

B. For an order enjoining Flux, and its agents, attorneys, and assigns, from asserting claims for violation of the CFAA or defamation against Plaintiffs in connection with the matters set out herein;

C. For an order enjoining Flux from misrepresenting itself as the source of Adafruit's circuit boards, and/or from marketing or selling circuit boards that infringe the distinctive and nonfunctional Circuit Playground Design;

D. For an order prohibiting Flux from misrepresenting the number of users of its products or services;

E. Awarding to Adafruit actual damages from Flux's unlawful acts alleged herein in an amount to be determined at trial;

F. Awarding to Adafruit additional damages according to the circumstances of the case pursuant to 15 U.S.C. § 1117(a);

G. Awarding to Adafruit Flux's profits from its unlawful acts alleged herein in an amount ot be determined at trial, with prejudgment interest on the foregoing sum;

H. Ordering that Adafruit recover the costs of this action together with reasonable attorneys' fees and prejudgment interest in accordance with 15 U.S.C. § 1117; and

I. Awarding to Plaintiffs such other and further relief as the Court deems just and proper, together with the costs and disbursements that Plaintiffs have incurred in connection with this action.

**JURY TRIAL DEMAND**

Plaintiffs hereby request a jury trial for all issues so triable in this action.

Dated: September 30, 2026

Respectfully submitted,

LEX LUMINA LLP

By: /s/ *Rhett O. Millsaps II*
Rhett O. Millsaps II (SBN 348949)
rhett@lex-lumina.com
Mark P. McKenna (appearing pro hac vice)
mark@lex-lumina.com
Christopher J. Sprigman (appearing pro hac vice)
chris@lex-lumina.com
700 S. Flower Street, Suite 1000
Los Angeles, CA 90017
Telephone: (213) 600-6063

STOBBS

Martin Schwimmer (appearing pro hac vice)
Martin.Schwimmer@iamstobbs.com
214 W. Tremont Avenue, Suite 303
Charlotte, NC 28203
Telephone: (704) 702-6007

*Attorneys for Plaintiffs Adafruit Industries, LLC, Phillip Torrone, and Limor Fried*

# ADDENDUM

Blackline Comparison with Original Complaint (ECF 1)

Rhett O. Millsaps II (SBN 348949)
_rhett@lex-lumina.com
Mark P. McKenna (appearing pro hac vice ~~forthcoming~~)
_mark@lex-lumina.com
Christopher J. Sprigman (appearing pro hac vice ~~forthcoming~~)
__chris@lex-lumina.com
LEX LUMINA LLP
700 S. Flower Street, Suite 1000
Los Angeles, CA 90017
Telephone: (213) 600-6063

Martin Schwimmer (appearing pro hac vice ~~forthcoming~~)
_Martin.Schwimmer@iamstobbs.com
STOBBS
214 W. Tremont Avenue, Suite 303
Charlotte, NC 28203
Telephone: (704) 702-6007

*Attorneys for Plaintiffs Adafruit Industries, LLC, Phillip Torrone, and Limor Fried*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| ADAFRUIT INDUSTRIES, LLC, PHILLIP TORRONE, and LIMOR FRIED,<br><br>Plaintiffs,<br><br>v.<br><br>DEFY GRAVITY, INC. d/b/a FLUX,<br><br>Defendant. | Case No. 3:26-cv-05480-LB<br><br>**AMENDED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Adafruit Industries, LLC ("Adafruit"), Phillip Torrone, and Limor Fried (collectively, "Plaintiffs"), by and through their undersigned counsel, for their ~~complaint~~Amended Complaint against defendant Defy Gravity, Inc. d/b/a Flux ("Defendant" or "Flux") hereby allege, on knowledge as to their own conduct and otherwise on information and belief, as follows:

**NATURE OF THE ACTION AND RELIEF SOUGHT**

1. This is a civil action seeking a declaratory judgment and injunctive relief arising from Flux's improper legal threats hastily delivered through its legal counsel, a former FBI chief of staff, in an attempt to silence industry-leading journalistic outlet Adafruit. It also seeks monetary and injunctive relief for Flux's false suggestion that circuit boards designed and produced by Adafruit were instead the result of Flux's process, or in the alternative, Flux's infringement of the distinctive and nonfunctional design of Adafruit's circuit boards. Finally, it seeks monetary and injunctive relief for Flux's literally false statements about the number of users of its services, which Flux made consistently available and featured prominently on its website.

2. Adafruit is a 100% woman-owned company based in Brooklyn, New York that designs, manufactures, and sells electronics and electronic components, including printed circuit boards. Adafruit also runs a blog, which is widely read among the "maker" community that designs and builds DIY electronics components.

3. In the course of interviewing Flux's founders for a possible feature story on Adafruit's blog, Adafruit's Managing Director, Torrone, discovered that Flux appeared to be misrepresenting usage of its purported "AI-assisted design platform." Specifically, Flux's claims that its platform had more than a million "builders" who were working on more than 6.4 million projects substantially inflated the number of both builders and projects, making the Flux platform appear to be much more successful and widely-used than it in fact is. Flux's misrepresentations were repeated by its associated venture capital firm, 8VC, and by a number of other publications.

4. Additionally, in the process of researching Flux, Torrone discovered a significant security flaw caused by a server misconfiguration that was out in the open—that is, all the information necessary to exploit the security vulnerability was publicly viewable by anyone on Flux's website.

5. On May 22, 2026, Torrone alerted Flux to his concerns about Flux's misrepresentations, told Flux that he would not be writing a feature story about Flux, and notified Flux about the security flaw.

6. Flux responded hours later on May 22 by sending a demand letter through counsel at a top U.S. law firm to Adafruit, Torrone, and Limor Fried, Adafruit's founder, claiming that Torrone's actions "violate U.S. criminal law" under the Computer Fraud and Abuse Act ("CFAA") and that his statements are "harassing, patently false, and potentially defamatory," without any colorable basis for those claims. Flux's letter demanded a response *by the next day*. Flux's letter also demanded, among other things, that Plaintiffs confirm in writing that none of them shared Flux information with any other parties, and that Plaintiffs refrain from sharing publicly any of the information that Torrone discovered regarding Flux's misrepresentations or its security flaw. Flux's letter closed with a request that Adafruit share the letter with legal counsel and then noted that Flux "reserves all rights"—which Adafruit, Torrone, and Fried reasonably understood, in context, to mean that they could expect legal claims to be filed against them imminently unless they agreed to Flux's demands.

7. Flux's frivolous claims are a gross violation of Plaintiffs' First Amendment rights. The claims are meant solely to bully Adafruit, Torrone, and Fried into staying quiet about Flux's misrepresentations about the size and reach of its platform—misrepresentations that are highly relevant to the community of makers and DIY electronics components enthusiasts that Adafruit serves.

8. Plaintiffs, who have a very reasonable apprehension that Flux will imminently file suit and/or instigate a criminal action against them, seek a judgment declaring that they neither defamed Flux nor violated the CFAA.

~~8.~~9. In the process of investigating Flux and Flux's misrepresentations about its own products, Adafruit also discovered that Flux has misleadingly promoted its products and services by misrepresenting the source of certain circuit boards. Specifically, in a February 27, 2026, interview with CNBC anchor Jon Fortt, Matthias Wagner, Chief Executive Officer of Flux, described Flux's services while holding a circuit board that was actually produced by Adafruit, falsely suggesting that the circuit board was designed and produced by Flux. Alternatively, if the circuit board was, in fact, a Flux product, then Flux infringed Adafruit's rights in its distinctive and nonfunctional circuit-board design by producing a competing circuit board that copied Adafruit's. Flux's marketing of circuit

boards that copy Adafruit's design is likely to confuse consumers about the source of Flux's products, or about Adafruit's sponsorship of or affiliation with Flux and its products.

**PARTIES**

~~9.~~10. Plaintiff Adafruit is a New York limited liability company with its principal place of business in Brooklyn, New York.

~~10.~~11. Plaintiff Torrone is the Managing Director of Adafruit. He resides in Brooklyn, New York.

~~11.~~12. Plaintiff Fried is the CEO of Adafruit. She resides in Brooklyn, New York.

~~12.~~13. Defendant Flux is a Delaware corporation with a principal place of business at 340 Bryant Street, Floor 3, San Francisco, California 94107.

**JURISDICTION AND VENUE**

~~13.~~14. The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and 15 U.S.C. § 1121 because Plaintiffs assert claims under the Lanham Act, 15 U.S.C. § 1051 et seq. The Court has jurisdiction under 28 U.S.C. § 1331 because Plaintiffs seek a declaratory judgment under 28 U.S.C. §§ 2201 and 2202 that Plaintiffs have not violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030. The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiffs' request for a declaratory judgment that Plaintiffs did not defame Flux and corresponding injunctive relief because the claims are so related by a common nucleus of facts that they form part of the same case and controversy. The Court also has supplemental jurisdiction over Plaintiffs' common law unfair competition claim, because that claim is so related to Plaintiffs' Lanham Act claims by a common nucleus of operative fact that it is part of the same case and controversy.

~~14.~~15. This Court has personal jurisdiction over Defendant Flux in this action because Flux's principal place of business is located within this District, and Flux has engaged in substantial business within this District.

~~15.~~16. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(1) and (2) because Defendant Flux conducts substantial business within this District, and a substantial part of the acts or omissions giving rise to Plaintiffs' claims occurred in this District.

## DIVISIONAL ASSIGNMENT

~~16.~~17. This action is properly assigned to the San Francisco Division of this District under Civil Local Rules 3-2(c) and 3-2(d) because Defendant Flux is headquartered in San Francisco County, which is the county where a substantial part of the events giving rise to Plaintiffs' claims occurred and where a substantial part of the property that is the subject of the action is situated.

## FACTUAL BACKGROUND

**Plaintiffs Adafruit, Torrone, and Fried**

~~17.~~18. Plaintiff Adafruit is a 100% women-owned manufacturing company and a certified Minority and Woman-owned Business Enterprise. It designs, manufactures, and sells electronics and electronic components, including printed circuit boards, in its factory lofts in Brooklyn's Industry City. Adafruit sells its wide variety of products on its website at www.adafruit.com.

~~18.~~19. Plaintiff Torrone is the Managing Director of Adafruit. He is married to Plaintiff ~~Limor~~ Fried. Torrone was previously director of new media for the digital design firm Braincraft and senior editor at *Make Magazine,* where he also worked on the Maker Shed online store and on Maker Faire, a family-friendly festival. He was also senior editor at *Popular Science,* how-to editor at *Engadget*, and founder of Hackaday.com.

~~19.~~20. Plaintiff Limor "Ladyada" Fried, an MIT-trained engineer, founded Adafruit in 2005. The Ladyada name honors Lady Ada Lovelace, one of the inventors of the computer. Fried has been named to the Forbes Innovator 250 list. She was the first female engineer featured on the cover of *Wired* ~~Magazine~~magazine.



~~20.~~21. In 2016, the White House named Fried a Champion of Change to honor her contributions to the "maker movement"—a global, technology-based extension of do-it-yourself ("DIY") culture that champions hands-on creativity, engineering, and innovation. The maker movement transitions people from passive consumers into active creators by utilizing digital fabrication tools, open-source hardware, and collaborative community spaces.




~~21.~~22. Adafruit maintains several social media accounts and other online outlets. Drawing on Torrone's extensive background as a journalist in the industry, Adafruit's outlets do much more than merely promote Adafruit's products—they allow Adafruit to function as a major voice in the maker/DIY and open-source hardware communities.

~~22.~~23. For example, Adafruit maintains a blog at https://blog.adafruit.com/. The blog has approximately 380,000 monthly users according to Google ~~analytics, which is only a partial accounting of the blog's reach~~Analytics. The blog breaks news stories in the DIY electronics industry and is notable for Adafruit's rigorous and transparent editorial standards set out at https://www.adafruit.com/editorialstandards. The blog's stories are regularly picked up by the leading press outlets serving the maker, DIY, and open-source hardware and software communities, such as *The Verge*, *Ars Technica*, *Engadget*, and *Slashdot*.

~~23.~~24. Adafruit also maintains a YouTube channel at https://www.youtube.com/@adafruit. Adafruit's YouTube channel has 467,000 subscribers and has published more than 11,000 videos.

~~24.~~25. Adafruit's account on the X social media platform (@adafruit) amplifies Adafruit's reach by publishing to its 241,100 followers posts that include links to its blog and YouTube channel. Adafruit also disseminates content through Mastodon (mastodon.cloud/@adafruit), Instagram (instgram.com/Adafruit), GitHub (github.com/Adafruit), Facebook (~~faebook~~facebook.com/adafruitindustries), and LinkedIn (linkedin.com/company/Adafruit).

~~25.~~26. Adafruit's social media outlets report on technical developments in the open-source and DIY world, spotlight projects created by customers and Adafruit staff, and disseminate educational material, such as "L is for LED", a video for children.




**Adafruit's Design and Development of Distinctive Circuit Boards**

27. In 2016, Adafruit designed and began selling a distinctive circuit board called Circuit Playground, now known as Circuit Playground Classic. Soon thereafter, the product family expanded to include the Circuit Playground Express, and then the Circuit Playground Bluefruit.

28. The Circuit Playground circuit boards share a common design, which consists of a round, palm-sized circuit board.



29. The Circuit Playground circuit boards are unique in appearance. The Circuit Playground Classic and Circuit Playground Express are characterized by their round shape, distinctive rounded alligator clip parts, 10-bulb RGB LED ring, balanced centered component layout, icons for each sensor/output, and "Adafruit Black" mask and gold plate (collectively, "the Circuit Playground Design"). The Circuit Playground Design sets the Circuit Playground circuit boards apart, visually, from any other circuit board offered in the market. The Circuit Playground Bluefruit shares all of those design features, except that it is blue rather than black.

30. In the circuit board product category, virtually all circuit boards are hidden away in opaque product cases. Adafruit designed the Circuit Playground line so that the circuit boards would be fun and compelling to look at.

31. Adafruit sells a translucent case with its Circuit Playground boards so that people can enjoy looking at the boards, even after they have been incorporated into a device.

32. The Circuit Playground Design has achieved secondary meaning through its widespread depiction in Adafruit's promotional efforts and in third-party media editorial coverage.

33. For example, the Circuit Playground Design has been displayed on covers of magazines that cover the electronics DIY industry.




34. Many of the individual features of the Circuit Playground Design are unique and unusual in the field, including the Adafruit Black mask, which is more expensive than the standard green color, and the gold plate, which is more expensive than the standard silver tin. The overall appearance of Adafruit's Circuit Playground Design is distinctive and has become known in the industry.

35. The Circuit Playground Design silhouette also appears on a commercially offered third-party shirt depicting Adafruit boards.




36. The Circuit Playground circuit boards have been widely reviewed. Reviewers on YouTube often depict the Circuit Playground Design.




37. The Circuit Playground Design appeared in the television series *Agents of S.H.I.E.L.D.*



38. The overall Circuit Playground Design is nonfunctional. The Circuit Playground Design is comprised of several ornamental features that, together as a whole, are not essential to the

use or purpose of the circuit board and increase its cost relative to standard features of competing circuit boards.




**Defendant Flux and Its Claims of One Million-Plus Users**

~~26.~~39. Flux claims to be an AI-assisted design platform. Specifically, on its website, Flux describes itself as "an AI-powered assistant that speeds-up tasks, provides real-time insights, and modifies your PCB [printed circuit board] design directly." A copy of a document provided on Flux's website titled "Getting Started with Flux" is attached hereto as Exhibit A.

~~27.~~40. On February 27, 2026, Flux published a post on its blog ("the Flux Blog Post") that stated in part: "To date, **1,099,361** builders have used Flux to create **6,425,482** projects, and this raise gives us the resources to move faster and to help more builders move through the hardware workflow with less friction." (emphasis in original). A copy of the Flux Blog Post is attached hereto as Exhibit B. That post was signed by "Lance, Matthias, and the Flux team." Lance Cassidy is the Founder and

Chief Operating Officer of Flux, and Matthias Wagner is the Founder and Chief Executive Officer of Flux.

~~28.~~41. On February 27, 2026, Flux caused a press release to be distributed to a public relations website, GlobalNewsWire, which stated in part: "More than 1 million makers, designers, and entrepreneurs have used Flux to design nearly 6.5 million devices, from wearables to robots to smart home controllers and drone navigation systems." Torrone became aware of Flux based on that press release, a copy of which is attached hereto as Exhibit C.

~~29.~~42. The information in the Flux Blog Post was widely disseminated. For example, on March 5, 2026, a tech industry publication, *The Top Voices*, reported that Flux had recently raised $37 million in new venture capital funding, repeating claims from the Flux Blog Post that "[t]oday, more than 1,099,361 builders have created over 6,425,482 projects on the platform, reflecting growing adoption across the hardware community." A copy of that article is attached hereto as Exhibit D.

~~30.~~43. Another industry publication, *The SaaS News*, also reported on the Flux funding round, stating that "[w]ith over **1 million** users designing nearly **6.5 million** devices globally, Flux empowers individuals and businesses to innovate across applications ranging from IoT devices to biomedical platforms" (emphasis added). A copy of that article is attached hereto as Exhibit E.

~~31.~~44. On February 27, 2026, the venture capital firm 8VC republished Flux's claim of one million users, posting on X that it was "Proud to lead @BuildWith Flux's $27M (sic) Series B . . . 1M users and 6.5 projects later, the creative hardware revolution is here." The 8VC post on X also embedded a 42 second video depicting Matthias Wagner promoting the Flux product. In that video, Wagner stated, "We've already seen millions of engineers turn their ideas into hardware with Flux." A screenshot of the post is attached hereto as Exhibit F.




**<u>Flux's Claim of 1 Million "Builders" Is False</u>**

~~32.~~45. On October 23, 2025, Flux claimed on its website home page to have 1,099,361 Builders. A copy of Flux's home page as of that date taken from the Wayback Machine is attached hereto as Exhibit G. Flux claimed to have 1,099,361 Builders on November 22, 2025. A copy of Flux's home page as of that date taken from the Wayback Machine is attached hereto as Exhibit H. On January 3, 2026, Flux claimed on its home page to have 1,099,361 Builders. A copy of Flux's home page as of that date taken from the Wayback Machine is attached hereto as Exhibit I. ~~And today,~~As of June 5, 2026, the date of Adafruit's initial complaint in this matter, Flux ~~claims~~claimed on its home page to have 1,099,361 Builders. A copy of Flux's home page as of ~~today~~that date is attached hereto as Exhibit J.

46. As of September 30, 2026, Flux continues to claim 1,099,361 Builders on its blog at https://www.flux.ai/p/blog/we-raised-37m-to-take-the-hard-out-of-hardware. A copy of that blog post taken today is attached hereto as Exhibit K (the "Blog Post").

~~33.~~47. In the context of Flux's home page, the reported number of Builders, Projects, and Components ~~will~~would be understood by market participants to represent an up-to-date count that changes rapidly— because people understand that there would need to be daily and continuous growth in the number of users for a start-up to achieve such significant user numbers. Market participants

would also note that the numbers “1,099,361”, “6,425,482”, and “821,334” (collectively, the “Numbers”), do not appear to be rounded estimates, but rather exact figures. For this reason as well, market participants are likely to perceive the Numbers as up-to-date, precise numbers, likely generated by an automated counter.

~~34.~~48. Upon information and belief, however, Flux did not use a counter applet to generate and display the Metrics. ~~Using the “Inspect” function on the Chrome browser, the code on the page flux.ai suggests that the Numbers were typed in, not generated by a counter, and that the specific Numbers were entered at least as early as October 23, 2025, and appear to be unchanged since then~~The purported counter displayed static text, and the same values appear in the preserved archival captures.

```
<div class="number-stats">1,099,361</div> == $0
<div class="text-block-64">Builders</div>
</div>
▼<div id="w-node-f5f0c11d-80cb-7674-e4a5-e071fd579606-3e9ce52b">
<div class="number-stats">6,425,482</div>
<div class="text-block-64">Projects</div>
</div>
▼<div id="w-node-_20f533dd-83d7-6204-de98-f3584cd9c526-3e9ce52b">
<div class="number-stats">821,334</div>
<div class="text-block-64">Components</div>
```

```
<div class="number-stats">1,099,361</div> == $0
<div class="text-block-64">Builders</div>
</div>
▼<div id="w-node-f5f0c11d-80cb-7674-e4a5-e071fd579606-3e9ce52b">
<div class="number-stats">6,425,482</div>
<div class="text-block-64">Projects</div>
</div>
▼<div id="w-node-_20f533dd-83d7-6204-de98-f3584cd9c526-3e9ce52b">
<div class="number-stats">821,334</div>
<div class="text-block-64">Components</div>
```

~~35.~~49. In sum, ~~static~~the same Numbers ~~have been presented publicly over a period of nearly~~appear in the preserved homepage captures from October 23, 2025, through at least as late as June 5, 2026, spanning more than seven months, to represent three ordinarily dynamic metrics of product use—registered user, projects, and components.

~~36.~~50. Flux's quotation of these precise Numbers in ~~the Flux~~Flux's Blog Post, and its repetition of ~~those~~the Numbers since then, suggest Flux's awareness of the Numbers ~~on~~in February ~~27.~~2026 (the date of its Blog Post). As the Numbers ~~are~~were viewable every day for more than seven months on Flux's home page, Flux presumably also ~~is~~was aware that the Numbers ~~are~~were static, and therefore wrong.

**Adafruit's Communications with Flux**

~~37.~~51. In his capacity as a technology journalist publishing on Adafruit's blog, Torrone reached out to Flux CEO Wagner on March 1, 2026. Torrone was interested in reviewing the Flux product because software that would greatly simplify the process of designing and fabricating printed circuit boards makes the platform of great interest to Adafruit's audience, many of whom are makers who might use Flux to design printed circuit boards and other DIY electronics hardware projects.

~~38.~~52. Over the course of March 2026, Torrone was in email dialogue with employees and representatives of Flux regarding a possible profile on the Adafruit blog. A copy of the 12 emails between Torrone and Flux during that time are attached hereto as Exhibit ~~K~~L.

~~39.~~53. The emails from Torrone consisted primarily of questions that Torrone drafted for Flux and 8VC, Flux's venture capital firm, regarding Flux's products and services. Flux copied Firebrand, Flux's public relations firm, and Firebrand provided the substantive responses to Torrone's questions. Many of those responses, especially to Torrone's requests for substantiation of Flux's claims regarding the number of users and projects on the platform, were evasive.

~~40.~~54. Relying on his experience as a participant and chronicler of the maker industry, Torrone was skeptical that a product targeting DIY engineers could have 1 million registered accounts and more than 6.4 million bona fide projects. In Torrone's experience, the maker market for printed circuit boards and other DIY electronics components was far too small to support such large numbers.

~~41.~~55. Torrone created a user account on Flux as part of his intended product review of Flux on the Adafruit blog.

~~42.~~56. In light of the evasive responses to some of Torrone's questions provided by Flux and Firebrand, Torrone began to form the opinion that Flux's claims regarding the number of users and projects on the platform were false. Flux declined to identify any customer of Flux, even if Torrone promised to maintain the anonymity of any such customer's identity in his reporting. Torrone doubted that a firm that claimed to have over one million customers could not identify a single customer who was willing to be identified.

~~43.~~57. Torrone's review of the projects shown on publicly accessible areas of the Flux website suggested to him that Flux's claims regarding the number of users and projects was considerably exaggerated.

~~44.~~58. On May 22, 2026, Torrone wrote to Flux stating that he believed that the claims made by Flux and their funders regarding the number of users and projects on Flux's platform were false. Torrone also came to the conclusion that certain other statements Flux made, for example statements regarding electronic components designed on Flux having been used in a space mission, were false.

~~45.~~59. In that same May 22 email, Torrone attached a short report regarding a security vulnerability he had noticed while using the Flux website. It is common in the industry for users to report security vulnerabilities like the one Torrone reported to Flux. While he was on the Flux site, Torrone noticed that the site had some performance issues, including failing to log out users who had requested to be logged out. In addition, it was Torrone's regular practice, when reviewing a web-based service like Flux, to determine whether the site might have security issues—Torrone's readership would expect that Torrone would ~~only~~ recommend only web-based services that had secure websites.

~~46.~~60. The information contained in Torrone's security vulnerability report to Flux was obtained by accessing information available out in the open to anyone who visits Flux's website. Neither Torrone nor anyone else at Adafruit ever bypassed a security measure on the Flux site or exceeded the scope of their permissions to learn of the security flaw. Torrone sought no benefit from

reporting this security vulnerability. He did it voluntarily and in a good faith effort to alert Flux to a problem with its website's security.

47.61. The information that creates the security vulnerability that Torrone reported to Flux can be accessed through the following steps, available to anyone visiting Flux's public website. These steps are visually depicted in Exhibit LM attached hereto.

i. Visit flux.ai website without a login;

ii. Open the browser's developer panel (the developer panel is a regular feature of modern browsers and can usually be accessed with a few keystrokes—for example, option+command+I on the Chrome browser running on a mac computer);

iii. In the developer panel, click on the Application pane;

iv. Locate the navigation bar for application keys/values on the left side;

v. Scroll and select/open to Storage -> IndexedDB -> firebaseLocalStorageDb -> firebaseLocalStorage;

vi. Locate the 'fbase_key' on the right side of the Applications pane. Click on the value (which sometimes opens to view) or select it all and paste into a text editor; and

vii. Locate the firebase apiKey, appName and stsTokenManager:accessToken (sts is for 'security token service') that is provisioned by Flux for anonymous use of the Flux website without the need to complete log-in credentials.

**Flux's May 22 Demand Letter to Adafruit**

48.62. Several hours after Torrone sent his May 22 email, Jonathan Lenzner, a former FBI chief of staff and a partner in the Fenwick law firm whom Fenwick touts as "a nationally recognized leader in high-stakes crisis management," acting on behalf of Flux, sent a demand letter to Adafruit (the "Demand Letter"),, attached hereto Exhibit M.N (the "Demand Letter").

49.63. Flux's Demand Letter asserts that Torrone's May 22 email contained "demonstrably false" statements that defamed Flux and its CEO. Further, it asserts that Adafruit's security disclosures

"violated federal law"—specifically the CFAA—and threatened *criminal* liability under the CFAA. Further, Flux's counsel asserted—without offering any evidence or explanation—that Adafruit and Limor Fried had "aided and abetted" Torrone's alleged lawbreaking.

~~50.~~64. On May 23, Adafruit acknowledged receipt of the Demand Letter through an email from its counsel. A copy of that email is attached hereto as Exhibit ~~N~~O.

~~51.~~65. On May 26, Adafruit, through counsel, requested clarification of several points in the Demand Letter relating to whether the alleged defamatory content had been published—which it has not been—and requested that Flux explain its theory as to why Torrone's activities were unlawful under the CFAA—which they plainly are not. A copy of Adafruit's counsel's email is attached hereto as Exhibit ~~O~~P.

66. On May 28, Flux reiterated its demands in an email from Lenzner, its counsel at Fenwick. Flux asserted that the defamatory content was published by means of copying Flux's venture capital firm 8VC —a firm that had publicly repeated Flux's false claims about the number of users and projects—on the emails between Torrone and Flux. Flux also claimed that the CFAA applied because, in its view, Torrone did not act in good faith. Lenzner concluded his email by stating, "Your timely provision of the information and assurances [previously demanded by Flux] is imperative if we are to move from a path of confrontation to a path toward resolution." A copy of Lenzner's May 28 email is attached hereto as Exhibit ~~P.~~Q.

**Flux's Misrepresentations Regarding Adafruit's Circuit Playground Design**

67. On February 27, 2026, Flux CEO Matthias Wagner was interviewed on the "Fortt Knox" video series on CNBC. Fortt Knox is a popular video series and podcast hosted by CNBC anchor Jon Fortt. CNBC promotes the series as one that consists of interviews with "innovators shaping the future and thinkers measuring the stakes." https://www.cnbc.com/fortt-knox/#:~:text=Jon%20Fortt%20speaks%20with%20innovators,VIDEO15%3A33. The video of the episode featuring Wagner remains available at https://www.cnbc.com/video/2026/02/27/matthias-wagner-flux-ceo-a-fortt-knox-conversation.html.

68. Fortt begins the interview with Wagner by asking Wagner what "is today's toughest problem that you're trying to solve at Flux?" Wagner responds that Flux is "lowering th[e] barrier" to making custom electronics hardware. According to Wagner, that's the tough problem Flux is solving for its customers—allowing them to make their own custom electronics to "have a more defensive position, lower the cost."

69. As Wagner explains how Flux is making it possible for customers to make their own custom electronics, he holds a circuit board in his hand to illustrate, specifically describing how "AI agents now enable [Flux] to automate the work, to go from a prompt to a … working appliance," implying that it was the Flux AI agents that enabled production of the working appliance in Wagner's hand. In fact, on information and belief, the board Wagner displayed is Adafruit's Circuit Playground Express. Adafruit's saved order records show an order for Circuit Playground Express products under Matthias Wagner and Defy Gravity Inc. dated December 25, 2019.

70. A few minutes later in the Fortt Knox episode, Wagner again holds up a Circuit Playground Express circuit board as he answers Fortt's question about use cases in which businesses "find it worthwhile and important to have this custom work done versus getting something off the shelf." Wagner describes a favorite example of a customer of Flux that makes vending machines. Before Flux, Wagner says, "they would buy four or five off the shelf PCB boards, integrate them into a single vending machine, you know, and assemble and sell that." In contrast to that costly approach, "now fast forward to them using Flux. They can make a single integrated board, where they pay pennies on the dollar because now they're paying to get *this* made." Wagner punctuates "this" by again holding up to the camera Adafruit's Circuit Playground Express circuit board.

71. Furthermore, in response to the very next question, Wagner again holds up Adafruit's Circuit Playground Express circuit board to explain how Flux gives engineers the time to build custom electronics hardware. Because the tooling for that hardware used to be designed to serve big enterprises, "it wasn't a process designed to be efficient, fast, cheap, that an SMB [small or medium business] can pick this up at scale. And so that's the big unlock here, but it's like, look, I think today

we help our customers build small to mid-size complexity electronics"—a statement Wagner emphasized with yet another display of Adafruit's Circuit Playground Express circuit board.

72. Wagner's repeated display of the Adafruit Circuit Playground Express circuit board in explaining Flux's AI-enabled design process implies that the circuit board displayed by Wagner is the result of Flux's process. Reasonable consumers would understand Wagner's reference to "this" to be a reference to the product in Wagner's hand, a product those consumers would reasonably understand to be a Flux-generated product. But, in fact, the distinctive Circuit Playground Express circuit board is an Adafruit product.

~~52.~~73. If, in the alternative, the circuit board displayed by Wagner was designed and produced by Flux, then Flux has copied Adafruit's distinctive and nonfunctional Circuit Playground Design. Many consumers in the DIY community recognize Adafruit's distinctive Circuit Playground Design, and those consumers are likely to be confused about the source of Flux's products, and/or about Adafruit's relationship with or sponsorship of Flux and its products.

## FIRST CLAIM FOR RELIEF

**Declaratory Judgment that Plaintiffs Have Not Violated the Computer Fraud and Abuse Act (18 U.S.C. § 1030) ("CFAA")**

~~53.~~74. Plaintiffs hereby incorporate by reference the allegations of the preceding paragraphs as though fully set forth herein.

~~54.~~75. Under the Declaratory Judgment Act, courts may "declare the rights and other legal relations" of parties "to a case of actual controversy." 28 U.S.C. § 2201.

~~55.~~76. An actual controversy exists between Adafruit, Torrone, and Fried, on the one hand, and Flux, on the other. Flux, through its demand letters and threats of litigation and false allegations of criminal conduct, is attempting to use the law to silence Adafruit, Torrone, and Fried, and to keep the falsity of its claims regarding its number of users and projects from being known.

~~56.~~77. Flux's claims that Torrone's accessing of information on the Flux website that was *publicly accessible* violated the CFAA are false, and Flux knows or should know they are false. Torrone did not engage in any unauthorized access of Flux's systems. He did not defeat any access

controls protecting private areas of Flux's site. Indeed, Torrone at no time accessed any areas of Flux's website or associated computer systems that were not open to any member of the public using Flux's site. Nor did Torrone see any files, or access any information, that were not available to any member of the public using Flux's site. And yet Flux has threatened Adafruit, Torrone, and Fried with litigation under the CFAA—and possible criminal referral—if they refuse to comply with Flux's demands, which are intended to keep Flux's materially false representations from becoming known to the public.

~~57.~~78. Adafruit, Torrone, and Fried therefore have a real and reasonable apprehension that they will be subject to legal action if they do not accede to Flux's demands. This apprehension was caused by Flux's actions, specifically its demand letters sent to Adafruit by Flux's counsel Lenzner threatening legal action, including possible criminal referral, against Adafruit, Torrone, and Fried.

79. On August 31, 2026, Flux provided Plaintiffs with a document titled "Release of Claim" that purports to release Plaintiffs Adafruit, Torrone, and Fried from any claim under the CFAA, stating that it "perpetually, unconditionally, and irrevocably releases and disclaims any intent to file any claim against Plaintiffs Adafruit Industries, LLC, Phillip Torrone, or Limor Fried under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, that is based upon or related to the actions by Plaintiffs that led to the 'security vulnerability report' sent by Torrone to Flux on May 22, 2026." But that release does not fully remove the CFAA threat. That CFAA also provides for potential criminal liability, which Flux's counsel threatened when he implied that Flux would refer Plaintiffs to the Department of Justice. That baseless threat remains outstanding.

~~58.~~80. The controversy between Plaintiffs and Flux is thus real and substantial and demands specific relief through a decree of a conclusive character.

~~59.~~81. Plaintiffs are entitled to declaratory judgment that they did not violate the CFAA in reporting to Flux a security flaw they discovered based wholly on publicly available information on Flux's website, including injunctive relief to enjoin Flux from making assertions that they violated the CFAA in doing so.

**SECOND CLAIM FOR RELIEF**
**Declaratory Judgment that Plaintiffs Did Not Defame Flux**

~~60.~~82. Plaintiffs hereby incorporate by reference the allegations of the preceding paragraphs as though fully set forth herein.

~~61.~~83. There is a real and actual controversy between Plaintiffs and Flux regarding whether the emails at issue sent by Torrone constitute defamation of Flux.

~~62.~~84. Torrone never made any false statements about Flux. Torrone informed Flux of his conclusion that Flux was overstating the number of users and projects and set out his basis for that conclusion. Flux's claims regarding its number of users and projects are in fact false, and thus Torrone's statements cannot be defamatory.

~~63.~~85. Torrone also did not publish any of his statements to third parties. Torrone included 8VC, Flux's venture capital firm, on the email communications at issue because 8VC adopted Flux's statements as its own and publicly repeated them, in the context of touting Flux's capital raise.

86. Additionally, a California Statement of Information filed on May 15, 2026 lists Francisco Gimenez—the 8VC partner whom Torrone included on his email communications—as one of three directors of Flux.

~~64.~~87. As discussed above, upon information and belief, Flux has misstated its number of registered users, or builders, and ~~the level of~~ projects created by the supposed builders. The failure of Flux to identify any meaningful level of use of its projects by third parties (as opposed to use by Flux employees and Flux-affiliated entities) suggests that Flux has materially misstated the level of customer acceptance for its product.

~~65.~~88. Flux's threat of legal action against Plaintiffs for defamation is intended to stop Plaintiffs from reporting the results of Torrone's investigation and thus has a deliberate chilling effect on Plaintiffs' First Amendment rights to speak and report on matters of public interest.

~~66.~~89. Plaintiffs are entitled to declaratory judgment that they did not defame Flux by making truthful statements about Flux's misrepresentation of its number of users and projects that were never published to any third party.

**THIRD CLAIM FOR RELIEF BY ADAFRUIT**
**False Designation of Origin (Reverse Passing Off)**

**in Violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A)**

90. Plaintiffs hereby incorporate by reference the allegations of the preceding paragraphs as though fully set forth herein.

91. Flux's repeated suggestion that Adafruit's Circuit Playground Express circuit board was in fact a Flux product constitutes a false designation of origin and a false representation that Flux is the source of Adafruit's Circuit Playground Express product in violation of Section 43(a)(1)(A) of the Lanham Act (15 U.S.C. § 1125(a)(1)(A)).

92. Flux's conduct is willful, deliberate, and intended to trade upon the goodwill, quality, and reputation of Adafruit's Circuit Playground Express circuit board and Circuit Playground Design.

93. As a direct and proximate result of Flux's aforesaid actions, Adafruit has suffered, and will continue to suffer, irreparable harm to its business, reputation, and goodwill.

94. Upon information and belief, Flux has obtained gains, profits and advantages as a result of its wrongful acts and will continue to do so in an amount thus far not determined.

95. Adafruit is entitled to injunctive relief, actual damages, disgorgement of Flux's profits, and attorneys' fees pursuant to 15 U.S.C. § 1117.

**FOURTH CLAIM FOR RELIEF BY ADAFRUIT**
**Trade Dress Infringement in Violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A)**

96. Plaintiffs hereby incorporate by reference the allegations of the preceding paragraphs as though fully set forth herein.

97. In the alternative, if the circuit board displayed by Wagner during the Fortt Knox episode was produced by Flux, then Flux is marketing a circuit board that copies Adafruit's distinctive and nonfunctional Circuit Playground Design.

98. Flux's marketing of its circuit board willfully infringes Adafruit's rights in the Circuit Playground Design in violation of Section 43(a)(1)(A) of the Lanham Act (15 U.S.C. § 1125(a)(1)(A)).

99. As a direct and proximate result of Flux's aforesaid actions, Adafruit has suffered, and will continue to suffer, irreparable harm to its business, reputation, and goodwill.

100. Upon information and belief, Flux has obtained gains, profits and advantages as a result of its wrongful acts and will continue to do so in an amount thus far not determined.

101. Adafruit is entitled to injunctive relief, actual damages, disgorgement of Flux's profits, and attorneys' fees pursuant to 15 U.S.C. § 1117.

## FIFTH CLAIM FOR RELIEF BY ADAFRUIT
## Common Law Unfair Competition

102. Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

103. Flux's acts of reverse passing off and/or its copying of the Circuit Playground Design constitute unfair competition under the common law of the State of California, causing injury and damage to Adafruit's business and reputation.

104. Upon information and belief, Flux has obtained gains, profits and advantages as a result of its wrongful acts and will continue to do so in an amount thus far not determined.

## SIXTH CLAIM FOR RELIEF BY ADAFRUIT
## False Advertising in Violation of the Lanham Act, 15 U.S.C. §1125(a)(1)(B)

105. Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

106. Flux made literally false statements on the Flux website and in other commercial advertising and promotion regarding the number of "builders" who have used Flux's products and the number of "projects" and "devices" those "builders" have made, in violation of Section 43(a)(1)(B) of the Lanham Act (15 U.S.C. § 1125(a)(1)(B)).

107. Flux's false statements harmed and continue to harm Adafruit by misrepresenting the level of consumer acceptance of Flux's products. Flux's false statements likely deceived and will continue to deceive consumers regarding the level of consumer acceptance of Flux's products. Flux's deception of consumers is likely to materially affect consumer purchasing decisions regarding Flux's products, to the detriment of others selling products or services in the relevant market, including Adafruit.

108. Upon information and belief, Flux has obtained gains, profits and advantages as a result of its wrongful acts and will continue to do so in an amount thus far not determined.

109. Adafruit is entitled to injunctive relief, actual damages, disgorgement of Flux's profits, and attorneys' fees pursuant to 15 U.S.C. § 1117.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendant Flux as follows:

A. For a declaratory judgment that Plaintiffs have not violated the CFAA or defamed Flux;

B. For an order enjoining Flux, and its agents, attorneys, and assigns, from asserting claims for violation of the CFAA or defamation against Plaintiffs in connection with the matters set out herein;

~~C. Plaintiffs' attorneys' fees and costs incurred in pursuing this action as permitted by law;~~

~~D. Pre-judgment and post-judgment interest; and~~

C. ~~For~~For an order enjoining Flux from misrepresenting itself as the source of Adafruit's circuit boards, and/or from marketing or selling circuit boards that infringe the distinctive and nonfunctional Circuit Playground Design;

D. For an order prohibiting Flux from misrepresenting the number of users of its products or services;

E. Awarding to Adafruit actual damages from Flux's unlawful acts alleged herein in an amount to be determined at trial;

F. Awarding to Adafruit additional damages according to the circumstances of the case pursuant to 15 U.S.C. § 1117(a);

G. Awarding to Adafruit Flux's profits from its unlawful acts alleged herein in an amount ot be determined at trial, with prejudgment interest on the foregoing sum;

H. Ordering that Adafruit recover the costs of this action together with reasonable attorneys' fees and prejudgment interest in accordance with 15 U.S.C. § 1117; and

~~E.~~I. Awarding to Plaintiffs such other and further relief as the Court deems just and proper, together with the costs and disbursements that Plaintiffs have incurred in connection with this action.

**JURY TRIAL DEMAND**

Plaintiffs hereby request a jury trial for all issues so triable in this action.

Dated: ~~June 5~~September 30, 2026 Respectfully submitted,

LEX LUMINA LLP

By: /s/ *Rhett O. Millsaps II*
Rhett O. Millsaps II (SBN 348949)
_rhett@lex-lumina.com
Mark P. McKenna (appearing pro hac vice ~~*forthcoming*~~)
_mark@lex-lumina.com
Christopher J. Sprigman (appearing pro hac vice ~~*forthcoming*~~)
_chris@lex-lumina.com
700 S. Flower Street, Suite 1000
Los Angeles, CA 90017
Telephone: ~~+1~~ (213~~.~~) 600~~.~~-6063

STOBBS

Martin Schwimmer (appearing pro hac vice ~~*forthcoming*~~)
_Martin.Schwimmer@iamstobbs.com
~~STOBBS~~
214 W. Tremont Avenue, Suite 303
Charlotte, NC 28203
Telephone: (704) 702-6007

*Attorneys for Plaintiffs Adafruit Industries, LLC, Phillip Torrone, and Limor Fried*